| 132 | 563 |
| 136 | 662 |
| 132 | 563 |
| 138 | 421 |

CHRIS DREFAHL, as Administrator of the Estate of Elizabeth Drefahl, deceased, Appellee, v. THE SECURITY SAVINGS BANK, and CARL RABE, Appellants.

CHRIS DREFAHL, as Administrator of the Estate of Elizabeth Drefahl, deceased, Appellee, v. CEDAR RAPIDS SAVINGS BANK, and CARL RABE, Appellants.

CHRIS DREFAHL, as Administrator of the Estate of Elizabeth Drefahl, deceased, Appellee, v. CARL RABE, Appellant.

**Estates of decedents:** RECOVERY OF FUNDS BY ADMINISTRATOR. In an action by an administrator against a bank and a third person for the recovery of funds alleged to belong to the estate, proof that a portion of the fund was transferred by order of deceased in her life time from her account to that of the third person, will not entitle the bank to have the petition dismissed, since the funds still remained in the bank the court will retain juris-

diction of all parties for the purpose of making a proper disposition thereof regardless of any entries on the bank books.

**Bad faith:** SUFFICIENCY OF PLEADING.  A plea that certain funds were obtained by defendant by unfair and undue means, while he was acting as agent and confidential advisor, is sufficient to raise an issue of bad faith.

**Confidential relations:** BURDEN OF PROOF.  Where a fiduciary and confidential relation is shown to exist, growing out of an agency, the burden is upon the agent to show entire fairness on his part in any transaction for his benefit and freedom of the other party from undue influence.

**Evidence:** CONVERSATIONS WITH A DECEDENT.  Evidence of conversations with one since deceased, which is against the interest of decedent and in which the witness took no part, is competent.

**Same:** RES GESTAE.  Declaration of a decedent to be competent on the ground of res gestæ must have been made near the time or in connection with the alleged transaction, and when offered on the ground that decedent was in possession of personal property must be explanatory thereof.

**Contracts for future support:** EVIDENCE.  In an action by an administrator to recover alleged funds of an estate on deposit, which defendant had had transferred to his account but which were not paid over to him, and to recover estate funds paid out by him without authority, the evidence is held sufficient to show an agreement between defendant and decedent by which he was to have the funds for his promise to support decedent the remainder of her life.

**Same.**  The evidence is also held sufficient to show that defendant performed his contract to support decedent.

**Signature:** USE OF LEAD PENCIL.  The fact that a lead pencil is used in making a signature will not effect its validity.

**Validity of signature:** INTOXICATION.  Intoxication at the time of signing a contract, unless the maker is rendered unable thereby to appreciate the nature of the act, will not affect the validity of the signature.

**Contract for support:** REASONABLENESS.  Under the proven circumstances a contract of an aged person to turn over to her trusted advisor the sum of $4,000 in consideration for her future support and burial expenses, is held not unfair though the obligor lived but a short time afterward.

*Appeal from Linn District Court.*— HON. J. H. PRESTON
Judge.

WEDNESDAY, MAY 9, 1906.

REHEARING DENIED, SATURDAY, DECEMBER 15, 1906.

THESE three cases are submitted together and, save the pleadings, upon the same record. Decree was entered in each for the plaintiff. The defendants in each appeal.— *Reversed.*

*Voris & Haas,* for appellants.

*Lewis Heins* and *B. L. Wick,* for appellee.

LADD, J.— Elizabeth Drefahl died intestate January 15, 1904, and a few days later the plaintiff, Chris Drefahl, her deceased husband's brother, was appointed administrator of the estate. On July 3d, preceding her death, she had on deposit with the Security Savings Bank of Cedar Rapids the sum of $2,075.70. Of this Carl Rabe withdrew $75.70 on that day, and $275 December 21st, following. Some deposits were made so that there was a balance in the bank of $1,865.75 on January 4, 1904. She also had on deposit with the Cedar Rapids Savings Bank $1,971.91 July 3, 1903, of which Rabe withdrew $71.91 on that day, and $250 December 21, 1903. There remained in the bank January 4, 1904, the sum of $1,650 with $37.15 accrued interest. On the day last named Rabe presented to this bank a check payable to himself purporting to bear her mark for the payment of the above amount. The check was honored, and the money transferred to his account, but is held by the bank to await the outcome of this suit. On the following day the amount on deposit with the Security Savings Bank was transferred in like manner. In these suits the administrator alleged that these funds belonged to the deceased and demanded a judgment that each bank pay him the amount on deposit with it, and a judgment against Rabe for such

amounts and any money of deceased received by him and not expended for her benefit or that of the estate. The defense interposed by each bank was that the funds had been transferred to Rabe by the authority of deceased. Rabe, who was made a party defendant with each bank, in separate answers, averred that in the month of July, 1903, he and deceased had entered into a contract by the terms of which he promised to support her the remainder of her life, in consideration for which she agreed to transfer to him the money on deposit with the banks, and that in pursuance thereof he did support her, and she delivered the depositor's books and executed the checks mentioned. The same defense was pleaded in the separate suit against Rabe. The plaintiff denied the averments of each answer, and, by way of a reply to that of Rabe, alleged that any contract made by him with deceased was that of agency, and that he continued to act as her agent up to the time of her death; and further that " whatever arrangement said Carl Rabe had with deceased was so had and obtained by reason of confidential relations existing between the said Carl Rabe and the deceased, and the same was procured by unfair and undue means, and the said acts of the deceased, if any, were not free and voluntary acts of the said deceased, and that, by reason of the ·confidential relations existing between said defendant and deceased, the said arrangement by and between the said Rabe and deceased, if any there was, was void in law." Upon hearing the relief sought by the plaintiff in each case was granted.

I. The issues to be determined are: (1) Whether such a contract as is alleged by Rabe was ever entered into with deceased; (2) if so, whether Rabe performed his part of the agreement; and (3) whether the deposits were transferred to him prior to her death. In their opening argument counsel for plaintiff proceed upon the theory that the moneys in the banks were claimed as a gift. No such issue is raised by

1. Estates of
DECEDENTS:
recovery of
funds by ad-
ministrator.

the pleadings. On the other hand, counsel for defendants insist that, upon proof of the transfer of the amounts on deposit to Rabe by virtue of checks signed by deceased, the petition as to them should have been dismissed. The issue fairly raised by the pleadings is not whether the money was regularly transferred on the books of the banks by virtue of the check of deceased, or whether the banks acted in good faith in honoring such checks, but whether the funds belonged to plaintiff as administrator of the estate of deceased or to the defendant Rabe. The answers of the banks show that the moneys claimed have not been withdrawn. They are still in their control, and, as all laying any claim to them are before the court, there is no reason why payment to the true owner, regardless of entries which may have been made on the books, may not be directed. If the deceased had not parted with title thereto, the deposits belong to plaintiff, and judgment that these be turned over to him was the relief specially prayed for.

Nor do we agree with appellants' counsel that no issue as to good faith on the part of Rabe is raised by the reply. The portion quoted is in the nature of a plea of confession **2. BAD FAITH: sufficiency of pleading.** and avoidance. It expressly avers that, whatever the arrangement, it was procured " by unfair and undue means " while Rabe was acting as deceased's agent and confidential adviser and was not free and voluntary. If so, then, as will be seen hereafter, such arrangement, even though entered into, cannot be enforced.

II. That Rabe had acted as the agent and confidential adviser of deceased is fully established by the record. Hays testified that he was such adviser and the manager of her **3. CONFIDENTIAL RELATIONS: burden of proof.** affairs, and Dinwiddie that he understood he was transacting her business, and this was not contradicted. She had appointed him to act in her behalf in depositing and withdrawing moneys at the Security Savings Bank, and he had signed her name to checks on both banks on the 3d of July, 1903, and subsequently on the 21st

of December following. Moreover, she was nearly 84 years old and so feeble that she required the care of an attendant, Mrs. Livermore, from some time in June, 1903, until her death. Under these circumstances, we think the burden of proof was on the defendants to show that any arrangement or agreement between deceased and Rabe was fairly and deliberately made. *Spargur v. Hall,* 62 Iowa, 498; *Condit v. Blackwell,* 22 N. J. Eq. 481; *Rochester v. Levering,* 104 Ind. 562 (4 N. E. 203); *Cook v. Berlin Woolen Mills Co.,* 43 Wis. 433, 444; 1 Am. & Eng. Ency. Law (2d Ed.) 1082. Courts of equity will closely scrutinize such transactions, and see that the agent shall not, by reason of the confidence reposed in him by the principal, secure to himself an undue advantage from the contract. The transaction must be reasonably challenged, and, when this is done, the onus is upon the agent to show that the bargain was fair and equitable. The principle is well stated by Mr. Freeman in a note to *Richmond's Appeal,* 21 Am. St. Rep. 101: "Wherever a fiduciary or confidential relation exists between the parties to a deed, gift, contract, or the like, the law implies a condition of superiority held by one of the parties over the other, so that in every such transaction between them, by which the superior party obtains a possible benefit, equity raises a presumption of undue influence and casts upon the party the burden of proof, to show affirmatively compliance with equitable requisites and of entire fairness on his part and freedom of the other from undue influence."

III. Was there such a contract as is alleged? Mrs. Rabe testified that she was present at a conversation between deceased and her husband which occurred in July, 1903,

4. EVIDENCE: conversations with a decedent.

and in which she took no part; that deceased proposed that she (Mrs. Drefahl) would give her money to Rabe, if he would keep her, give her a good burial, and pay her funeral expenses, to which he responded that he would. The competency of this evidence is questioned, but, as it did not relate to any communication or

transaction between the witness and deceased, it was admissible. *Johnson v. Johnson,* 52 Iowa, 586; *Erusha v. Tomash,* 98 Iowa, 510. This was corroborated by the testimony of defendant's son, who related that he was at the home of deceased in July, 1903, when she remarked, " Fred, what do you suppose I done ? " and upon inquiry explained that she had turned all her money over to his father, for him to support her as long as she lived, and " then what is left is his "; that she had given him the bankbooks and supposed he had the money then; that he was to give her a good burial, and, if he died first, then the witness' sister was to care for her and for so doing was to have the house and lot. According to the witness, this conversation was repeated, in substance, at several different times. A daughter of defendant also testified to a similar conversation with her in September of that year, and to a conversation between deceased and defendant about Christmas, in which the former said, " My son, have you got that money fixed so you can get it and nobody else ? " That defendant replied, " In one bank it is all right, but in the other you will have to sign another paper or check," and she responded, " All right, you bring it, because I want you to have it, and I will have it fixed so you will have it right any way." That she was willing to do anything so he could get it. The witness disclosed that at about the same time deceased turned to her and said: " If your father should die before I do, I want you to take care of me, and this house and this land shall be yours." One Merritt testified that, two or three months before her death, in a conversation about sawing her wood, she had told him to saw it, and Mr. Rabe would pay him, and added: " Gave him all my money. He pays my bills and takes care of me as long as I live and buries me." Charles Drefahl, a brother of Mrs. Rabe, swore that he called on her the 1st day of the year 1904, when she said: " Charley, it is New Years to-day. If I had some money, I would give you some as a New Year's present. Well, I

gave my money to Carl Rabe, and he is to keep me my lifetime." On cross-examination: " She said that she had given her books and money to Carl Rabe for him to take care of her for her lifetime." If this statement was made, it must have been in the way of an excuse, for she then had money in her possession. To the physician attending in her last illness she said, if he is to be believed, that she had " given Mr. Rabe all of her money. That Mr. Rabe would pay her bill."

While some of this evidence of declarations may be explained on the theory that deceased gave Rabe the money as agent, this is not true of portions of that of four of the witnesses. These plaintiff could not well be expected to directly contradict, as only the witness with defendant and the deceased were present at any of the conversations. Of necessity the credibility of such evidence must be tested by its inherent defects, if any, comparison with other evidence in the case, and by the ordinary rules of human conduct under like circumstances. These witnesses were related to Rabe, but this, while indicating that their testimony should be closely scrutinized, will not justify its rejection.

Their credibility was not assailed by impeachment, nor are they contradicted by any circumstance, save possibly by the statements of certain witnesses that they heard deceased declare, in substance, that Rabe was after her money, and that she did not want him to have it, and the conduct of Rabe. But this evidence was inadmissible for the reason that the alleged declarations were not against the interest of deceased. That such is the rule appears from *Westcott v. Westcott,* 75 Iowa, 628; *Davis v. Nelson,* 66 Iowa, 715; *Mahaska Co. v. Ingalls,* 16 Iowa, 81; *Moehn v. Moehn,* 105 Iowa, 716. See *Ellis v. Newell,* 120 Iowa, 71; *Britt v. Hall,* 116 Iowa, 564. The principle is founded upon human natrue. Self-interest of persons operates as an inducement to be cautious in saying anything against themselves, but free to speak in their own favor. For this reason statements

prejudicial to their own interest by deceased persons are received in evidence, thereby " substituting for the sanction of a judicial oath the more powerful sanction of a sacrifice of self-interest." See Wigmore on Ev., section 1457. *Sherman v. Sherman,* 75 Iowa, 136, is readily distinguishable from the case at bar. There the issue was whether the plaintiff had made a gift of a note of the defendant in handing it to him, and, in rebuttal of evidence of a declaration by plaintiff to this effect, he was allowed to show that within two hours previous he had made declarations to the contrary, as bearing upon the intent with which he had acted. Here the defendant relies upon a contract, not a gift, and certainly such prior declarations in her own interest were not competent as tending to show that she did not enter into it, or that she was induced to do so by unfair means. *Mallow v. Walker,* 115 Iowa, 238; *Muir v. Miller,* 72 Iowa, 585.

Nor were they a part of the *res gestae,* as contended, for they do not appear to have been made near the time of, or in connection with, the agreement alleged. Neither were

**5. SAME:**
*res gestae:*
they admissible on the theory that deceased was in possession, for the declarations were in no way explanatory thereof. See *Walkley v. Clark,* 107 Iowa, 451; *Nodle v. Hawthorn,* 107 Iowa, 380.

But it is said that Rabe continued to act as her agent. He had been such. The only circumstance indicating that he so continued is the fact that he signed both her name and

**6. CONTRACT
FOR FUTURE
SUPPORT:
evidence.**
his to certain checks. But this is not controlling, for payment was not essential to the validity of the contract. The money on deposit had not been turned over to him on the books of the banks. It remained on deposit in the deceased's name. True, he was in possession of the deposit books, and she had delivered them to him for the purpose of transferring to him the funds on deposit. Possibly, but for the banks' rules, this would have operated as a transfer of the

funds. *Camp's Appeal,* 36 Conn. 88 (4 Am. Rep. 39);
*Hill v. Stevenson,* 63 Me. 364 (18 Am. Rep. 231); *Taft v.
Bowker,* 132 Mass. 277; *Watson v. Watson,* 69 Vt. 243 (39
Atl. 201; *Polley v. Hicks,* 58 Ohio St. 218 (50 N. E. 809,
41 L. R. A. 858); *Ridden v. Thrall,* 125 N. Y. 572 (26 N.
E. 628, 1 L. R. A. 684, 21 Am. St. Rep. 758). This is upon
the theory that the entries on the deposit book of a savings
bank always show the exact state of the accounts, and these
answer the same purpose as certificates of deposit issued by
other banks. Printed in the front of each book, however,
was a requirement that it be presented at the bank by the
depositor in order to withdraw money or be accompanied by
his written order when presented by another. This explains
how he came to sign her name as well as his own to the
checks. But, as said, neither payment nor the transfer of
the deposits was essential to a finding that there was such
an agreement as alleged, or that it was performed by him,
and his possession of the books is quite as consistent with
the relation of agent as with the thought that she had deliv-
ered them in pursuance of the agreement. But he was in
possession, and the testimony that she had admitted having
given them to him in pursuance of the contract is undis-
puted. A careful examination of the record has failed to
discover any sufficient reason for rejecting the evidence of
the witnesses tending to prove the existence of a contract
such as is averred in Rabe's answer, and we think it abundant
to establish the same.

IV. The appellee argues that, even if Rabe promised
to support deceased, he did not fulfill his promise. She re-
sided in a house of her own, and continued to do so until
her death. A Mrs. Livermore, who had been
employed by deceased, continued to care for
her. That Rabe and his wife were at her home frequently
is conceded. Nothing was done without consulting him.
He bought groceries and provisions for her, procured wood
and had it sawed for her, and gave her such care as was

7. SAME.

reasonably required.  Undoubtedly the neighbors remembered her with eatables occasionally, but to say that they supported her is a perversion of the record.  It may be that during the last six weeks of her life she consumed more intoxicating liquors than she should, and that Rabe sometimes indulged with her; but this furnishes no evidence that the contract was induced by improper means several months previous, and there is no claim in the pleadings that Rabe improperly performed his part of the contract.

V. The deceased fell and sprained her arm January 2, 1904.  The following day was Sunday, and on Monday Rabe presented a check to the Cedar Rapids Savings Bank payable to himself, and signed by deceased, dated December 31st, previous, and the deposit was transferred to his account.  The

8. SIGNATURE: use of lead pencil.

cashier of the other bank prepared a couple of like checks on it, and, after she had signed them, they were presented the next day and a like transfer made.  All these checks were signed by making her mark.  The evidence showing that she so did is uncontradicted, save by appellee's suspicions.  These may be enumerated:  (1) Her mark was by lead pencil, when on other occasions ink had been used; (2) the mark is an X, when at other times it had been a +; (3) because one was dated December 31st, the first day on which business could have been transacted previous to her injury, and the others after the accident, and when she was suffering therefrom, and physically too weak; (4) for that other parties were about the house and did not know of it; (5) Rabe tried to transfer the money to his name the first business day after the injury; and (6) it is said he undertook to bribe a witness to aid him.  It will be seen at a glance that all grounds of suspicion do not arise to the dignity of evidence.  Citation of authority is not necessary to show that it is immaterial with what kind of an instrument a signature is made.  In one instance at least, her mark in ink had been an X.  The testimony of the witness that he of-

fered her $1,000 to aid him had no connection with signing the checks. Moreover, the story is incredible. She does not appear to have been in a situation to render assistance, and he denies the story. The other suspicions require no attention.

The deceased appears to have been of sound mind, and the evidence does not show that she was intoxicated when the checks were signed. Moreover, they were executed in fulfillment of her agreement with Rabe, and, even though she may have been under the influence of liquor, they should not be disregarded, unless she was unable to appreciate the nature of her act.

9. VALIDITY OF SIGNATURE: intoxication.

VI. There was nothing unfair about the contract. While deceased was advanced in years, she might have survived a long time and proven a great care. Had this happened, the compensation would not have been out of proportion to the services exacted. That she lived but a few months cannot defeat his right to the consideration stipulated. *Harlan v. Harlan,* 102 Iowa, 701. Moreover, she had no relative by blood living in this country. When Rabe first came from Germany thirty-four years previous he had lived with deceased and her husband the first year and thereafter within a short distance. He had married the niece of her husband, and the families had been intimate. He was her adviser in times of trouble. No especial intimacy is shown to have existed between her and the brothers of her husband. In these circumstances it was not unnatural that she should look to him for support in the helplessness of age, and that for this she should be willing to abundantly compensate him for whatever might be required.

10. CONTRACT FOR SUPPORT: reasonableness.

In our opinion the petition in each of the cases should have been dismissed.

*Reversed.*